MEMORANDUM OF DECISION
On October 31, 1997, the Department of Children and Families, CT Page 11820 hereafter "DCF," filed coterminous petitions for neglect and for the termination of the parental rights of Stacie M. and John M.[2] to their son, Jonathan M., who is now one year and five months old. Jonathan was placed in foster care on October 29, 1997, after a fight in the home between his mother and father concerning his care. His mother had been absent from the household for two weeks, on a cocaine "binge".[3] Upon her return, Jonathan's father refused to leave the baby with her while he left for work, as he thought she was high on drugs. They clashed verbally and physically with Jonathan between them. After the police arrived, Stacie was arrested and Jonathan was immediately placed in foster care. On October 31, 1997, DCF secured an order of temporary custody (Ward, J.). As to neglect, DCF alleged both that Jonathan had been denied proper care and attention, physically, educationally and morally and also that he was being permitted to live under conditions, circumstances or associations injurious to his well-being. The termination petition alleged that the child has been denied, by reason of an act of parental commission or omission, the care, guidance or control necessary for his physical, educational, or emotional well-being. Connecticut General Statutes § 17a-112(c)(3)(C). Jonathan has remained in foster care since October, 1997 and has regular visitation with his mother and father. Stacie had an older child, Dalilah Rose N., who was removed from her care. Her rights to this child were terminated (Foley, J.) on December 16, 1996, order rectified on February 14, 1997. This judgment was affirmed in a per curiam decision of the Appellate court, In reDalilah N., 48 Conn. App. 921 (1998).
On June 19, 1998, DCF filed a motion to amend the petition to allege that Stacie's rights to a previous child had been terminated and that she has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time considering the age and needs of the child, she could assume a responsible position in the life of the child. Connecticut General Statutes § 17a-112(c)(3)(E). The court granted the amendment, retaining the original adjudicatory date of October 31, 1997.
The court finds that both parents were duly served, have appeared and have court appointed attorneys. Both Stacie and John appeared during the two days of trial on October 8, 1998 and October 9, 1998 and vigorously contested the petitions. The court further finds that there are no other pending proceedings effecting the custody of Jonathan and that it has jurisdiction in CT Page 11821 this matter. The court heard the testimony of two DCF social workers; Mary Painter, a drug and alcohol counselor at the Wheeler Clinic; Dr. David Mantell, the court-appointed psychologist; Sergeant William McKone concerning the arrest of October 29, 1997; Aliza Miller, the clinic supervisor of the Hartford Dispensary; and Pamela Kryszak of the Grove Hill Medical Center. Each of the parents took the witness stand to testify. There were twenty-five exhibits. The court, having reviewed the verified petition, the social studies, and the various documents entered into evidence, and having heard the testimony of the various witnesses, makes the following factual findings:
 1. THE FACTS
A. The mother, Stacie M.
Stacie M. is now twenty-four years old and had an extraordinarily troubled history as a child and an adolescent. Her past family history was extensively reviewed In Re DalilahRose N., (Docket No. H12-CP94-000043A, Dec. 16, 1996, Foley, J). This decision became an exhibit in the present case. From that evidence, the court finds that, when Stacie was two years old, her parents separated and she remained with her father. She never saw her mother again, as her mother died some years later. Both her mother and father used drugs and drank alcohol to excess. Stacie believes that she suffers from Fetal Alcohol Syndrome, due to her mother's alcohol abuse while pregnant. The course of her life appears to confirm her own assessment. Studies have shown that such children not only have a variety of cognitive difficulties, but also suffer from social deficits as well. One study found that "they were stubborn, hard to discipline and have extreme difficulty in respecting their own and other people's boundaries. (They) inappropriately sought affection and demanded attention and were overly tactile with other people." By the time they reach adolescence, "lack of judgment, poor decision-making, high frustration, impulsivity, and difficulty in perceiving social cues rended these children at high risk for aggressive behavior and of being co-opted by negative role models."[4]
Until she was nine, Stacie was raised by her father. By that age, her father could not handle her and asked for the assistance of DCF, which provided some assistance. When Stacie was ten, she was placed with DCF in a residential home. In an evaluation performed at that time, the professionals found evidence of extensive sexual abuse, although Stacie herself never CT Page 11822 disclosed such abuse. A year later, Stacie returned to her father's home, then lived with her paternal grandparents for a year and by age thirteen was back in foster care. Until she turned eighteen, Stacy had many different placements and her disturbed emotional condition required psychiatric treatment and hospitalization. She was diagnosed with depression, oppositional defiant disorder, and alcohol, marijuana and cocaine abuse. During her adolescence while in DCF's care, she ran away from at least three placements, and then engaged in sexual activities with strangers and active drug use. Dr. Gallalee, a psychiatrist at Lake Grove, a residential facility where she had been placed, stated that Stacie was "an extremely disturbed girl whose disturbance goes back to early childhood. What is remarkable in reviewing her record is the consistency of her disturbance and its seemingly intractable nature."[5] Ultimately, the Connecticut child protection system failed in its mission to help this child and could not provide her with enough stability and support to enable her to complete her high school education. She was only able to finish the tenth grade before she reached the age of majority, when she wanted nothing more than to leave DCF behind her.
As a young adult, Stacie continued the pattern she had begun earlier; abusing drugs and having indiscriminate sexual contact. On January 6, 1994, when Stacie was nineteen, her oldest child, Dalilah, was born prematurely. Hospital staff were concerned about Stacie and her ability to care for a small, immature infant. Nonetheless, Stacie and Dalilah were discharged from the hospital. After only three weeks, an order of temporary custody was secured, based on three referrals documenting Stacie's neglect of Dalilah. The father of the child was never involved to any degree and questioned his paternity as he and Stacie were not that "close". Despite substantial efforts by DCF to promote reunification and drug treatment, Stacie's parental rights to Dalilah were terminated on December 16, 1996. The foster mother, who was committed to reunifying Stacie with her infant, "noted that she knew almost immediately that Stacie would never overcome her own neediness such that she could provide the necessary self-sacrifice to effectively parent, this foster mother also recognized that what Stacie needed, more than anything, was a mother for herself"[6] The court concluded at that time "Stacie has no capacity to mother a fragile, demanding infant. Stacie's condition and behavioral difficulties long ante-dated DCF's intervention in this case."[7]
CT Page 11823
In 1994, Stacie met John M., the father of her youngest child, Jonathan. They met at an AA meeting, and quickly became intimate. Stacie and John have been living together for at least three years and Stacie is dependent on John for financial support, as she has never held a job for any length of time. John M. is now sixty years old and has a long history of heroin abuse with intermittent periods of abstinence. Both Stacie and John also have a history of involvement with the criminal justice system. Stacie's record reflects minor offenses and reveals a conviction for disorderly conduct for which she was arrested in 1993. She was convicted of larceny in the sixth degree, criminal impersonation, and threatening in 1996. Despite her admission in court that she resorted to prostitution to support her drug habit, she has never been charged with prostitution.
When Stacie learned she was again pregnant in 1996, she determined, to her credit, that things would be different for her and for her unborn child. She would "do the right thing this time." She attended all her prenatal physician's appointments, took her vitamins and stopped using cocaine. Her testimony was corroborated by the physician's assistant, who stated that Stacie followed directions and wanted to learn as much as possible about caring for an infant. There was no evidence of drug use. The assistant stated that Stacie often asked relevant questions and also attended parenting classes in December of 1996, before Jonathan's birth. Jonathan was a full term baby, born on May 19, 1997. There were no complications from the birth, either for Jonathan or for Stacie.[8]
Stacie and Jonathan returned to the apartment where she had been living with John. For a number of months, all was well and Stacie was able to maintain her sobriety. But by late September, 1997, she began to go out, leaving the baby behind. She testified she engaged in prostitution to buy cocaine, which she then regularly ingested to get "high and party." She admitted that she took these actions on her own and John never procured drugs for her. In September, 1998, she testified that she took Jonathan in a stroller to an Off-Track Betting parlor in the late afternoon. She left him in the care of an casual acquaintance and was gone over four hours, trying to buy drugs. Finally, the person with whom the child was left called John, who came to get the child. What was striking about her description of the incident was her insistence that no harm came to Jonathan at the Off-Track Betting establishment. She believed her friend took good care of her four month old child and then his father came to get him. CT Page 11824
Her cocaine use escalated and, by early October, 1997, she left Jonathan with his father for several days at a time. On October 13, 1997, there was a police incident report made by John, that Stacie had returned after several days away and high on drugs. He and Stacie had a verbal domestic dispute, because he refused to hand Jonathan over to her. John reported that he did not feel safe leaving the child with her. Stacie admitted to the police that she had "fallen off the wagon and ended up . . . doing things she was not supposed" to do, Nonetheless, Stacie did not then appear to be under the influence of drugs, according to the observations of the investigating officer[9]. At that time, John also reported that some days earlier, he had returned home to find Stacie passed out on the couch and the baby fallen out of the baby swing on the floor. John also testified to this incident at trial downplaying its significance.
No action was taken based on the report, although there was a referral made to DCF. Several days later, a DCF investigations worker met with John and on October 21, 1997, he entered into a signed service agreement with DCF. John was directed to pursue custody through the Probate court, not engage in any substance abuse, provide adequate supervision for Jonathan, pursue parenting support at the YWCA, apply for financial assistance for the baby and cooperate with DCF.
Unfortunately, the police contact of October 13, 1997 was not a wake-up call for either John or Stacie that their lifestyle was endangering their son and might lead to his removal. John did not begin to comply with the recommendations made in the service agreement. Stacie continued her drug "binge" and John was left to care for Jonathan for two weeks until October 29, 1997. John had difficulty managing both his job and providing the care Jonathan required. Initially, he testified that he took the baby with him to work at the pizza restaurant where he was employed, driving a truck. After several days, one of the owners, who had been watching the baby, advised him that it was not an appropriate place to leave the baby. Thereafter, John stayed home from work for a few days and finally arranged for a woman who worked at the diner across the street to care for Jonathan.
On the afternoon of October 29, 1997, Stacie came home from her "binge". When John began to get ready to go to work and prepare Jonathan to be taken to the babysitter, he and Stacie again fought. This time, somehow Stacie took Jonathan in her arms CT Page 11825 and she and John fought physically while she was holding the child. Stacie was angry, combative and high on drugs. She scuffled with the police, still holding Jonathan and was arrested.[10] She remained incarcerated overnight. As a result of this second domestic dispute, Jonathan was removed from the care of his parents and placed into foster care. Two days later, on October 31, 1997, the present coterminous petitions for neglect and for termination of parental rights were filed by DCF.
Following Jonathan's removal, both parents cooperated with DCF to regain their son. Each participated in drug counseling and submitted to random urine screens. Despite services, Stacie continued to abuse drugs. From the records, the court concludes that Stacie continued to abuse cocaine until the end of January, 1998. Drug screens have shown no drugs in her system since that time. Nonetheless, Stacie confessed to her counselor, Ms. Capers, that "she had prostituted for cocaine" in July, 1998. During her testimony before the court, Stacie also admitted that she had engaged in prostitution in July. When questioned about her drug use in July, her response was that she did not recall reporting drug use to the counselor. Quite telling to the court was her failure to deny use of drugs in July. The court concludes from the testimony that Stacie had a brief relapse and did use cocaine as recently as July, 1998.
DCF referred Stacie to a number of institutions to deal with her drug addiction. Both she and John have been and continue to be seen at the Hartford Dispensary, where they receive methadone. In December, 1997, Stacie entered an intensive inpatient forty-five day treatment program at Blue Hills Hospital. Shortly after the completion of the program in late January, she returned to drug abuse, as evidenced by her urine tests. Next, she received outpatient treatment at the Wheeler Clinic. In addition to the group counseling Stacie attended, she also received medication for her depression and Bi-Polar disorder. Mary Painter, a drug and alcohol counselor, testified that Stacie was discharged from this program, because the program was not designed to deal with substance abusers who also had been diagnosed with psychiatric difficulties. Stacie was subsequently referred to LifeLine, a program for substance abusers with psychiatric problems, or "dual-diagnosis" patients at an area hospital. Stacie was not accepted formally into this program, as she had previously been treated there and so was ineligible. Nonetheless, she was provided her medication and medically followed. In addition, she received counseling about addiction. CT Page 11826
The Wheeler Clinic also performed a substance abuse/dependency evaluation of Stacie, which is undated, but was received by DCF on March 30, 1998.[11] The report chronicles Stacie's extensive history of drug abuse, demonstrating that she is poly-addicted. Based on Stacie's own report to the evaluator, she began using alcohol at sixteen, cocaine at eighteen, heroin at twenty when she took ten to twelve bags a day for the next two years, and downers at twenty-one. From this report and other evidence, the court concludes that Stacie has been actively abusing drugs and alcohol for eight years, with periods of remission. The evaluation further reports that Stacie's prognosis at that time was considered to be fair and that she had no sober support system to help her achieve and maintain sobriety.
As in the earlier proceedings regarding the termination of her parental rights to Dalilah, the psychologist who evaluated the family, Dr. David Mantell, concluded that Stacie had significant limitations as a parent. In his professional opinion, Stacie "presents with chronic features of intellectual and personality problems that impair her parental capacity and appear to preclude responsible child care."[12] He recommended that termination of her right to Jonathan was in the child's best interest, due to the precariousness of her recovery.
Dr. David Mantell characterized Stacie's period of sobriety in May, 1998 as a "sudden flight into health." He explained that Stacie saw that her life was out of control and she tried to improve this by stopping her substance abuse, prostitution and arguing, what he described were
 "high risk problems and extreme behaviors which are not compatible with safe child care. That they were so very recent by their very nature speaks of a person who can suddenly lurch out of control with patterns which are dangerous to her and anyone who is with her — especially a vulnerable young child."
He used the term "sudden flight into health" as a term of art to describe "what appears to be a sudden recovery from a debilitating condition and is not a reflection of a genuine recovery, but only the appearance of that recovery." He stated that this is "someone who has a chronic disorder and who recognized that things are out of control and who hurries up to get better for external reasons." He also found that the triggers CT Page 11827 for her relapse and return to drug use in the fall of 1997 were not precipitated by the occurrence of any unusual events, but by normal life stresses. He testified that Stacie had reported to him that sometime after Jonathan's birth, she began to feel empty inside and returned to drug use to fill that emptiness. He reported that Stacie also stated to him that after her child was removed and because she so very much wanted him returned, she began to deal with her addictions to achieve sobriety. He concluded that her recovery was too fragile and of too short a duration to permit the return of Jonathan to her and that the danger of relapse remained too high.
B. The Father, John M.
Like Stacie, whose life course has been deeply scarred by drug and alcohol abuse, John, too, has struggled with a heroin addiction, which began when he was a young man serving in the Armed Forces. He reported to Dr. Mantell that he has had some long periods of sobriety, but that in the past few years, he has returned to heroin use. He testified that he has regularly used heroin in the last few years, including 1997 and 1998, using heroin as recently as three weeks before trial. John is maintained on methadone, which he receives from the Hartford Dispensary. The records there of his random urine screens show the presence of drugs in his system on almost every occasion he has been tested; an average of four times a month, from October, 1997 to September, 1998.
John M. previously has been married twice and has three adult children. He has been employed throughout his life. He has a record of criminal convictions. His most recent contact with the criminal justice system was in August, 1994, when he was charged with possessing drug paraphernalia and criminal trespass. Earlier In 1994, he was convicted of larceny in the sixth degree. His records show convictions for larceny and possession of drug paraphernalia in 1990 and 1991. In 1990, he was convicted, among other charges, of promoting prostitution and sentenced to a term of imprisonment. Despite his problems with his addiction, he has been employed for the past three years at a pizza parlor, where he drives a truck. His income supports Stacie, who remains unemployed.
Given the long term pattern of John's addiction, Dr. Mantell, in evaluating him, found him to be "pleasant and good-intentioned man who falls apart under pressure and at those times, he is not CT Page 11828 able to function satisfactorily." He remained seriously concerned about John M.'s ability to maintain his sobriety. Dr. Mantell noted that he interacted well with his son during the evaluation, although he did not see a parent-child connection. In his evaluation he concluded that:
 "The father is seen as a psycho-socially marginal man with limited ability to provide for his child. His relationship with the child's mother, his age, and his habits including substance abuse with recent relapses all significantly limit his parental capacity and raise strong concerns about his ability to minimally meet his child's needs on a regular basis."[13]
John M. admitted at trial that he was not ready to parent Jonathan at the present time. He stated that first he must take care of his own addiction problems and get more counseling, "whatever it takes." He also viewed Stacie as the parent who would provide most of Jonathan's care, if the child were returned. In his opinion, he stated, Stacie can be a good mother. He also thought that Stacie was not ready to have Jonathan in her care immediately, due to her own problems.
C. Reasonable Efforts
The petitions assert that, as of October 31, 1997, DCF had made reasonable efforts to reunify the family. The DCF case worker, Angela Buccheri, testified that in the two weeks between the initial referral on October 13, 1997 and Jonathan's removal on October 29, 1997, DCF had not been able to provide the parents with any services. While it is correct that the parents were not during that time referred to any specific services, this testimony overlooks the investigation made by DCF during this time period and the service agreement entered into with John to prevent the removal of the child. The service agreement of October 21, 1997 reflects a reasonable assessment of the family's situation known to DCF at the time, as it recommended several courses of action that John could take to protect Jonathan. The most important of these were the direction to seek custody of the child through the Probate court and to refrain from drug use. However, John did not attempt to implement any of the recommendations during the week that ended with Jonathan's removal from his parents. The court concludes, from the clear and convincing evidence, that the efforts made in the short period of time available were reasonable under all the circumstances. CT Page 11829
There is also no doubt that reasonable efforts toward reunification continued after the filing of the petitions. Those efforts included not only the treatment referrals for the parents, which the court has already reviewed, but ongoing case management services and weekly visitation with Jonathan. Neither Stacie nor John claim that they were dissatisfied with the services offered to them post-petition.
 2. NEGLECT ADJUDICATION
In hearing coterminous petitions for neglect and termination, the court "first adjudicates whether there is neglect. Only when a finding of neglect is made does the court move on to the dispositional phase of the neglect petition. Disposition in a neglect petition may take one of a number of forms, including return to parent, return to parents with a protective order, foster care placement or the initiation of proceedings to terminate parental rights." In re Juvenile Appeal (84-AB),192 Conn. 254, 261, 446 A.2d 808, (1984). (Internal citations omitted.) The standard of proof in the neglect phase is by a fair preponderance of the evidence and in the termination phase, if reached, by clear and convincing evidence, a more stringent requirement. Connecticut Practice Book (Rev. 1998) § 33.12, Connecticut General Statutes § 17a-112(b).
In accordance with the statutory requirements and the case law, the court finds by a fair preponderance of the evidence that both parents had neglected their son, Jonathan, pursuant to Connecticut General Statutes § 46b-120(8)(B) and (C) as of October 31, 1997. Because of the drug use of each parent, Jonathan had been denied proper care and attention, physically, educationally or morally and also that he was being permitted to live under conditions, circumstances or associations injurious to his well-being. The court adjudicates Jonathan a neglected child.
 3. TERMINATION ADJUDICATION
A termination petition which can result in severing family ties implicates serious constitutional concerns. The United States Supreme Court held in Santosky v. Kramer, 455 U.S. 745,753 (1982) that:
 "The fundamental liberty interest of natural parents in the care, custody and management of their child does CT Page 11830 not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."
But a parent's constitutional rights do not exist in isolation without reference to the rights of others in the family, community and the larger society in which the individual functions. And in particular, they do not override a child's right to be safe and to grow and to be nurtured in a supportive environment. "The Government's function in seeking to terminate parental rights and place a child in an adoptive home is an aspect of the state's role as parens patriae. It is important to note in this relation that the ultimate standard underlying the whole statutory scheme regulating child welfare is the `best interest of the child.'" In re Juvenile Appeal (Docket No.10155), 187 Conn. 431, 439, 446 A.2d 808 (1982). As set forth in Connecticut General Statutes § 17a-101(a): "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect."
Stacie argues that because she has fulfilled the tasks that DCF requested of her, it is fundamentally unfair now to terminate her parental rights to Jonathan. While she did not articulate this position in a constitutional framework, her fulfillment of specific tasks would not in and of itself be the end of the court's inquiry. The court has found that Stacie's struggle to overcome her addiction has only just begun. Simply attending programs to which a parent is referred is not the goal; actual personal change and growth in the direction of being able to meet a child's needs is what is required. It was abundantly demonstrated to the court, which had the opportunity to listen to and observe Stacie, that not only did she not understand the impact of her drug use on her child, but that she also did not comprehend the personal changes she needed to make to remain sober. As has been noted, "it is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio,123 Conn. 88, 92, 192 A.2d 557 (1937). And the court concludes, based on the testimony, that Stacie has not fulfilled the interim steps as they connect to her drug rehabilitation.
Both Stacie and John have engaged in drug abuse while their CT Page 11831 infant son was in their care. Fortunately for Jonathan, no physical harm came to him as a result of his parents' drug use. But it would only have been a matter of time before their drug use inflicted physical injury to Jonathan, which was fortunately prevented by DCF's timely intervention. For the sad fact remains, that parents who are using drugs or alcohol are not available, either emotionally or physically, to nurture a child, as neither Stacie nor John were for Jonathan on a consistent basis. In the two months that Stacie returned to active drug use between September and October 29, 1997, she left Jonathan with an inappropriate and unknown caretaker at the Off Track Betting Center. She, while in a drug-induced stupor, allowed Jonathan to slip out of his baby swing and land on the floor. During the times when she was on drugs and caring for Jonathan in her apartment, she could not have responded to his cues for feeding, comfort, interaction or engaged in play with him, all necessary interactions for his growth and normal cognitive development. Her responses to her infant would have been inconsistent and unreliable and inhibited the emerging sense of consistency and trust formation that an infant cared for by a sober, aware, and dedicated caretaker would achieve.
When Stacie left Jonathan for two weeks, the child would have experienced, at an infant's level, a sense of abandonment by his primary caretaker. His father, too, was actively using drugs. While John provided physical care for his son, he, like Stacie, left the child with caretakers unknown to Jonathan. And in the midst of it all, Jonathan was exposed on at least two occasions to the emotional turmoil that the angry fighting between his parents caused.
The court concludes that the conduct of both of Jonathan's parents tore at the very fabric of the family they were trying to form and prevented them from providing the constant attention a helpless, dependent infant requires. Each act of ingesting cocaine or heroin by Stacie and John was an act of commission which rendered each unable to function as a nurturing parent to Jonathan. Their use of drugs continued for a period of at least two months, almost half of their child's short lifetime. The court concludes that their acts inflicted serious emotional injury to Jonathan. In re Kelly S., 29 Conn. App. 600, 614,616 A.2d 1161 (1992), In re Sean H., 24 Conn. App. 135, 144-145,586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991). With respect to the statutory grounds for termination of parental rights, the court finds, by clear and convincing evidence, that CT Page 11832 as of October 31, 1997, based on the ongoing drug use of each of his parents, Jonathan had been denied, by reason of acts of parental omission as well as commission, the care, guidance or control necessary for his physical, educational, moral and emotional well-being as set forth in Connecticut General Statutes § 17a-112(c)(3)(C).
Further, based on clear and convincing evidence, the court further concludes that Stacie M. had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of her child, she could assume a responsible position in Jonathan's life. Connecticut General Statutes § 17a-112(c)(3)(E). The court has found that Stacie's most recent lapse into drug use was in July, 1998. The court notes, that to her credit, she had periods of abstinence during her entire pregnancy and for the five months between January, 1998 to July, 1998. While she has begun the process of drug rehabilitation, the court concludes that she has not been able to understand and deal with the causes of her addiction, nor has she been able to structure her life to remove herself from the temptation of ongoing drug use. Her recovery, the court concludes, is fragile and of short duration. Her drug use is pervasive and of many years standing, and the danger to Jonathan too great that she could again "suddenly lurch out of control" as Dr. Mantell found, and place Jonathan at risk.
"`Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." In re Migdalia M., 6 Conn. App. 194,203, 504 A.2d 532 (1986). See also: In re Juvenile Appeal,1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802,474 A.2d 1259 (1984). There is no doubt that Stacie has far to go to accomplish such an outcome. Rehabilitation within the foreseeable future is not likely. The court has previously found that Stacie's rights to another child were terminated.
 4. REQUIRED FINDINGS
Before considering the dispositional phase of the termination proceeding, the court makes the following factual findings based upon the clear and convincing evidence required by Connecticut General Statutes § 17a-112(e):
1) Appropriate and timely services were provided by DCF, including counseling, drug treatment referrals, transportation CT Page 11833 assistance, and visitation coordination. The services offered were extensive.
2) The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. While only a few efforts were possible prior to Jonathan's removal from the home, considerably more efforts have been made in the ten months since that time. Both parents received ongoing and significant services for reunification, but have not been able to rehabilitate themselves.
3) DCF set reasonable and realistic goals embodied in the service agreement with John M. and in the interim steps set forth with the filing of the coterminous petitions. Neither parent was able to remain drug-free for any substantial period of time or to fulfill the interim steps established.
4) The feelings and emotional ties of the child with respect to the parents, any guardian the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the child has developed significant emotional ties. Jonathan interacts with his parents during visitation. Both of his parents have shown great dedication in visiting him whenever possible. They clearly love their son and in the ways open and possible for them, show their love of him. However, the child's bond to them has become attenuated. Dr. Mantell found that there was no observable parent-child bond. While it is the case that Jonathan has not been in foster care yet for one year, he is also connected to his foster parents.
5) Finding regarding the age of the child. Jonathan is seventeen months old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with the parents, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. Both parents have made great efforts to maintain contact with Jonathan in an effort CT Page 11834 to reunite with him. Their visits with him have gone well. Their struggle with drug addiction continues. Stacie's recovery is fragile. John's recovery cannot be said to have yet begun. The court concludes that both parents have been unable, as previously found, to adjust their conduct to make a return of Jonathan to their care a feasible option in the foreseeable future, given Jonathan's age and own needs for permanency and stability of care.
7) Finding regarding the prevention of the parents from having a meaningful relationship with the child. No inappropriate conduct is noted. DCF has taken many steps to encourage both parents to have a meaningful relationship with Jonathan and to help them with their addictions.
Also required for adjudication is a finding by the court that either the facts warranting the adjudication have existed for more than one year prior to the filing of the petition or that under the totality of the circumstances, it is in the best interests of the child that the time period be waived. Connecticut General Statutes 17a-112(d)(1). Waiver of the one year requirement is within the court's sound discretion. In reRomance M., 30 Conn. App. 839, 622 A.2d 1047, appeal dismissed,229 Conn. 345, 641 A.2d 378 (1993). In re Christine F.,6 Conn. App. 360, 505 A.2d 734 (1986). The waiver is appropriate in this case where the mother's recovery from her addiction is short-lived and fragile and where the father has not yet begun to recover. Waiting for the short remaining time required by the general provisions of the statute would serve no purpose and is not in the best interests of Jonathan, who deserves permanency in his life. The court concludes that it is in Jonathan's best interests that the one year time requirement be waived and it is so ordered.
 5. DISPOSITION
John M. has strenuously argued that his grown daughter, who resides in Florida, be considered as a placement resource for his son. He admits he cannot care for the child, but wants to ensure that the child is placed within his extended family and is not lost to him. His daughter has indicated she would consider taking the child, if the parents' rights were terminated and he were available for adoption. DCF is presently investigating Jonathan's half-sister as a possible resource pursuant to the Interstate Compact. At trial, the court denied John's motion for a CT Page 11835 continuance to complete the investigation, as any decision concerning such placement would be post-trial and was not properly before the court. There also remains the issue, if the placement were otherwise suitable, whether it would be best for Jonathan, whose attachment for the last eleven and one-half months has been to his foster family in Connecticut.
In determining what is an appropriate disposition in any termination case, the court must be guided by what is in the best interests of the child. The evidence has shown that Jonathan has been in the care of his foster parents since he was five months old. Dr. Mantell concluded that the foster mother was his psychological parent and that there was a parent-child bond between them. The foster mother was the person to whom Jonathan looked for stability and nurturing and to meet his day-to-day needs. While Jonathan's interactions with his parents and their interactions with him were appropriate, they did not exhibit the same bond.
At the present time, at the conclusion of the trial in this matter on October 9, 1998, the court finds that neither John or Stacie is able to care for their son in the foreseeable future. Jonathan is faring well in his foster home, which is meeting his needs. The foster parents are his psychological parents. The court concludes that Jonathan needs the stability and consistency that are provided in this home. Based upon the foregoing findings, the court determines that it is in Jonathan's best interests that a termination of parental rights enter with respect to his mother, Stacie M. and his father, John M. A termination of their parental rights is ordered. Further, the court orders that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent of Jonathan for purposes of securing a permanent placement for him. If his foster parents are willing to adopt Jonathan, it is the court's direction that they receive serious consideration. In addition, a permanency plan for this child shall be submitted within ninety days and a review plan for him shall be filed in accordance with state and federal law.
Barbara M. Quinn, Judge Child Protection Session